IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

BAILEY CLEMMONS,                    )
                                    )
              Plaintiff,            )
                                    )
       v.                           )        1:16CV482
                                    )
GUILFORD TECHNICAL COMMUNITY        )
COLLEGE; QUENTIN JOHNSON,           )
                                    )
              Defendants.

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge.

     This action arises out of Plaintiff's long-term suspension
from classes at a community college for alleged violations of the
student code of conduct.    Before the court are the parties'
competing motions for summary judgment (Docs. 30, 34) and
Plaintiff's motion to strike evidence outside the administrative
record (Doc. 38).    For the reasons that follow, the court will
deny Plaintiff's motions, grant Defendants' motion for summary
judgment on Plaintiff's federal claims, and remand the action to
State court for further consideration of Plaintiff's State-law
claims under the North Carolina Constitution and North Carolina's
Administrative Procedure Act.

**I.   BACKGROUND**

     Plaintiff Bailey Clemmons enrolled as a student in the dental
assisting program for the 2015 academic year at Guilford Technical
Community College ("GTCC"), a public community college in

Jamestown, North Carolina.  (Doc. 11 ¶ 3; Doc. 31 ¶ 3; Doc. 35 ¶ 3.)  On September 15, 2015, she was walking her dog, Penelope, near her home in Durham, when the pet was tragically struck and killed by a car.  (Doc. 4 ¶ 6; Doc. 11 ¶ 6; Doc. 31 ¶ 6.)  Clemmons sent a text message to her professor, Sherry Shook, explaining: "Good morning, Mrs. Shook.  This is Bailey.  I won't be in class today.  My sister died in a car accident this morning."[1]  (Doc. 35 ¶ 8(a); Doc. 35-6 at 3, 8.)   When Professor Shook contacted Clemmons later that evening, Clemmons thanked the teacher for her consolation and responded, "It is not easy.  Life is different now at home."  (Doc. 35-6 at 3.)  Clemmons missed the next two days of classes.  (Id. at 4.)  As gestures of sympathy, Clemmons's peers purchased a card and collected money – described as "close to $200" – in honor of her sister.  (Id. at 5; Doc. 35-13 at 6-7; Doc. 35-14 at 27.)

Mrs. Snider, the GTCC dental assisting department chair, also emailed her condolences as to Clemmons's "little sister" and assured Clemmons that "[t]his certainly qualifies as an extenuating circumstance, so you will not be penalized for absences during this time. . . . Stay with your family."  (Doc. 35-6 at 7.)  The next day, Clemmons informed Mrs. Snider that she was in the process of making funeral arrangements.  (Id.)  Clemmons also

---

[1] Clemmons sent a similar message to a classmate.  (Doc. 35 ¶ 8(a).)

2

reported to her instructors that there was going to be a memorial service for her sister at Kingdom Hall on September 18, 2015, and that she would be taking a few days off for "mental mollification." (Id. at 3; Doc. 35 ¶ 8(b).) Clemmons further explained that, because the service would be shortly thereafter, she would be wearing her black dress to class. (Doc. 35 ¶ 8(c); Doc. 35-6 at 4.) Clemmons also spoke to Violeta Herrera, an administrative assistant in the dental department, and informed her that she had two sisters, Madison and Penelope, and that Penelope was the sister who died. (Doc. 35-6 at 5.)

Because of her absences, Clemmons was reaching the maximum number allowable without incurring an academic penalty. (Id.) On multiple occasions, Professor Shook and Dr. Richard Foster, director of the dental program, inquired about an obituary and requested that Clemmons bring one to GTCC officials so that her absences could be excused. (Id.; Doc. 35 ¶ 8.) Clemmons agreed to do so. (Doc. 35-6 at 5.) About ten days into the charade, however, GTCC faculty discovered through Facebook that Penelope was not Clemmons's sister, but her dog. (Doc. 35 ¶ 8k.) Dr. Foster then filed a formal complaint, charging that Clemmons had violated GTCC's Student Conduct Policy. (Id. ¶ 6; Doc. 35-9 at 2-3).

Students enrolled at GTCC are provided and required to comply with several policies, guidelines, and regulations (Doc. 35—4 at

3

2), including GTCC's Student Conduct Policy (also referred to as the "Student Code of Conduct"). (Doc. 35 ¶ 9; Doc. 36 ¶ 4).[2] That policy provides:

> Students may not display conduct on Guilford Technical Community College premises or at GTCC sponsored events that adversely affects the college's educational objectives, is illegal, or is contrary to the rules and regulations of the college. Students who display such conduct shall be subject to disciplinary action under the college's disciplinary policy. The Student Code of Conduct may also apply to off-campus incidents or behaviors when college administrators determine that off-campus conduct affects a substantial interest of the college. The student has the right to appeal disciplinary action. A full text of the Student Policy and disciplinary procedures is available in the Medlin Campus Center (Jamestown Campus), Suite 320.
>
> Conduct prohibited by this rule shall be determined by the President, consistent with this definition.

(Doc. 35-9 at 2.) The policy goes on to set out prohibited conduct by means of an illustrative list - which expressly "does not include all conduct that could be prohibited" – and includes

---

[2] The GTCC Student Handbook governs all GTCC students. Dental assisting students also have policies and rules for their specific program: GTCC Dental Assisting Dental Hygiene Student Handbook (Doc. 35-1); GTCC Dental Assisting Clinic Manual (Doc. 35-2); and GTCC Student Orientation Handbook: Dental Assisting and Dental Hygiene Programs (Doc. 35-3). (Doc. 35 ¶ 4.) As with the Student Conduct Policy, these policies require students to conduct themselves in a professional manner, which includes exercising honesty, integrity, and sound ethical judgment. (Doc. 35-1 at 2-5 (e.g., prohibiting "fabrication and falsification" in an academic exercise); Doc. 35-2 at 2-4 ("[p]roviding information one knows to be false to a College official, hearing officer or judicial body in connection with any investigation into any actual or potential academic honesty policy violation"), 7-8 (requiring honest communication with faculty); Doc. 35-3 at 3 ("Inherent to the ethical and professional expectations for students is the expectation that students will consistently practice honesty, genuineness, and authenticity in all of their academic endeavors and pursuits while enrolled at GTCC.").)

"[f]orgery, alteration, or misuse of college documents, records, or instruments of identification providing false information to the college"; "[a]buse of the Student Code of Conduct, including but not limited to . . . falsifying, distorting or misrepresenting before a Disciplinary Review Committee"; and "[b]ehavior that adversely impacts the learning environment adversely affecting the college community's pursuit of its educational purposes." (Id. at 2-3.)

On October 2, Michael Hughes, Chief Disciplinary Officer at GTCC, informed Clemmons of the claims against her and that he would be investigating. (Doc. 35 ¶¶ 6-7; Doc. 35-7.) Hughes explained that Clemmons was alleged to have violated two provisions of the GTCC Student Conduct Policy: (1) forgery, alteration, or misuse of college documents, records, or instruments of identification providing false information to the college, and (2) violation of local, state, or federal criminal law on college premises. (Doc. 35-7 at 3.) Clemmons emailed Hughes on October 6, writing that she took full responsibility for the miscommunication. (Doc. 31 ¶ 11; Doc. 31-2.) Hughes and Clemmons met on October 7, when Hughes informed Clemmons that she was accused of providing false information to GTCC, stating falsely that her sister had died in a car accident. (Doc. 35 ¶ 7.) After the meeting, on October 23, Hughes determined that Clemmons had violated the Student Conduct Policy by providing false information to a college official and

5

placed her on restricted probation for four semesters. (Id. ¶ 12; Doc. 35-10.)

On October 26, Clemmons appealed Hughes' decision to the GTCC Review Committee. (Doc. 31 ¶ 16.) A hearing for her appeal was set for November 3. (Id.) Before the hearing, Hughes emailed Clemmons to inform her of the witnesses that GTCC officials would call and information concerning her rights during the hearing. (Doc. 35-12 at 3-5.) These rights included the right to have counsel present, the right to call witnesses and present evidence, and the right to testify or refuse to testify. (Id.) Hughes' email noted, however, that if Clemmons elected to have counsel present at the hearing, her counsel could not address the committee. (Id. at 3.) Hughes's email also explained that the Review Committee would determine appropriate sanctions, which would not be limited to those imposed by Hughes. (Id. at 4.) Clemmons also had the right to appeal the Review Committee's decision, but only for two grounds: (1) the severity of the penalty, or (2) an alleged violation of GTCC's procedures during the hearing or investigation. (Doc. 35-17 at 8.)

At the hearing, faculty and students testified that Clemmons told them that her ten-year-old sister had been killed. Faculty witnesses also expressed concerns about whether Clemmons could be trusted, especially during clinic rotations. (Doc. 35-13 at 31-32, 44-45; Doc. 35-14 at 32-34.) At the hearing, Clemmons

6

discussed the service held for her dog at a local place of worship. (Doc. 35-15 at 5.) But on November 9, when asked about the service, Clemmons stated that there was no service; instead, a few individuals had convened to comfort her. (Doc. 35-16 at 2.) Clemmons later argued that her hearing testimony was a miscommunication. (Id.) The Review Committee voted to suspend Clemmons until the fall 2016 semester. (Doc. 35 ¶¶ 21, 23; Doc. 35-17 at 2.) The Review Committee also mandated that Clemmons complete ethics training before re-enrolling. (Doc. 35-17 at 2.)

Clemmons again appealed her decision to Dr. Quentin Johnson, Vice President of Student Support Services. (Doc. 4 ¶ 17; Doc. 11 ¶ 3; Doc. 35 ¶¶ 23-24.) Johnson affirmed the Review Committee's decision, finding no violation of GTCC's procedures during the hearing or investigation and concluding that the sanction imposed was appropriate. (Doc. 35-18 at 2.) Because Clemmons was suspended and could not complete her coursework, GTCC gave her failing grades for her incomplete courses. (Doc. 31 ¶ 22.)

On February 25, 2016, Clemmons filed this action, as amended, against GTCC and Johnson in Durham County Superior Court (Doc. 1-1), and Defendants timely removed the case to this court (Doc. 1). Clemmons seeks reversal and expungement of her long-term suspension, alteration of her failing grades to incomplete grades, a refund of any tuition paid to GTCC by or on her behalf, an injunction, and attorneys' fees. Following discovery, the parties

7

filed competing motions for summary judgment. (Docs. 30, 34.) Clemmons later moved to strike certain evidence GTCC submitted, arguing that it is inadmissible because it was not a part of GTCC's administrative record. (Doc. 38.)

## II.  ANALYSIS

Summary judgment is appropriate where the pleadings, affidavits, and other proper discovery materials demonstrate that no genuine dispute as to any material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-33 (1986). The party seeking summary judgment bears the burden of initially demonstrating the absence of a genuine dispute as to any material fact. Celotex, 477 U.S. at 323. If this burden is met, the nonmoving party must then affirmatively demonstrate a genuine dispute of material fact which requires trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). There is no issue for trial unless sufficient evidence favoring the nonmoving party exists for a factfinder to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 257 (1986).

### A.  Federal Claims

#### 1.  Claims against GTCC

GTCC moves to dismiss Clemmons's federal claims against it on the grounds it is not a "person" under 42 U.S.C. § 1983 and is

8

otherwise immune from suit under the Eleventh Amendment. Clemmons argues that GTCC waived its immunity under the Eleventh Amendment by removing the action to federal court.

Title 42, Section 1983 provides a right of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." GTCC is State-funded. N.C. Gen. Stat. § 115D-31; Miller v. Guilford Tech. Cmty. Coll., No. 2:96CV00329, 1998 U.S. Dist. LEXIS 15153, at *6 (M.D.N.C. June 15, 1998). State-funded colleges and universities are alter egos of the State. Huang v. Board of Governors of the Univ. of N.C., 902 F.2d 1134, 1138 (4th Cir. 1990); Miller, 1998 U.S. Dist. LEXIS 15153, at *6. Because GTCC is an agency of the State, it is not a "person" within the ambit of § 1983, and Clemmons's constitutional claim against GTCC is therefore not cognizable. Will v. Michigan Dep't of State Police, 491 U.S. 58, 64 (1989) ("a State is not a person within the meaning of § 1983"); Mann v. Winston Salem State Univ., No. 1:14CV1054, 2015 WL 5336146, at *4 (M.D.N.C. Sept. 14, 2015) ("Because WSSU is an agency of the State of North Carolina, it is not a 'person' within the meaning of § 1983 and thus does not fall within the purview of § 1983."); Googerdy v. N. Carolina Agr. & Tech. State

9

<u>Univ.</u>, 386 F. Supp. 2d 618, 625 (M.D.N.C. 2005) (dismissing plaintiff's § 1983 claim for monetary and injunctive relief because State university is not a "person" under 1983).

Clemmons's argument that GTCC waived its immunity under the Eleventh Amendment by removing the action to federal court is thus immaterial as to GTCC. <u>Will</u>, 491 U.S. at 66-67 (rejecting proposition that the scope of sovereign immunity under the Eleventh Amendment and the scope of § 1983 are not separate issues – "[c]ertainly they are"). In any event, the Supreme Court foreclosed this argument in <u>Lapides v. Bd. of Regents of Univ. Sys. of Georgia</u>, reiterating that a § 1983 claim is not valid where the defendant – there a State; here, an alter-ego of a State – is not a "person" under the statute, even if the defendant removed the action to federal court. 535 U.S. 613, 617 (2002).

For these reasons, Clemmons's § 1983 claim against GTCC will be dismissed.

### 2. Claims against Johnson

Johnson is sued only in his official capacity as GTCC's Vice President of Student Support Services. While Johnson is "person" within common parlance, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office." <u>Will</u>, 491 U.S. at 71. Thus, Clemmons's claim for money damages against Johnson in his official capacity fails for the same reason as above: he is not a

10

"person" within the meaning of § 1983. Id. ("We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."). Clemmons's § 1983 claim for monetary relief against Johnson will be dismissed.

Clemmons's claims against Johnson seeking prospective injunctive relief are cognizable, however, as such claims are treated differently under § 1983. Id. at 65 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (citations omitted); Kentucky v. Graham, 473 U.S. 159, 167 n.14 (1985) ("official-capacity actions for prospective relief are not treated as actions against the State").

The court will address each federal claim advanced against Johnson in turn.

### a. First Amendment

Clemmons contends that she is entitled to summary judgment because GTCC imposed discipline against her based on her speech and therefore violated her rights under the First Amendment to the United States Constitution. (Doc. 4 at 4; Doc. 33 at 6-8.) Clemmons maintains that her speech cannot be regulated by GTCC, as it was an "expression of grief" and did not affect the rights of other students. (Doc. 33 at 7.) According to Johnson, Clemmons's speech falls outside of the protections of the First Amendment

11

because it was false, entitling him to summary judgment. (Doc. 40 at 6-10.) Johnson also argues that he was justified in disciplining Clemmons and did not violate her constitutional rights. (Id. at 10-12.)

When assessing Clemmons's First Amendment claim, the court must conduct a three-part analysis. First, the court must determine whether Clemmons engaged in protected speech. Second, it must identify the nature of the forum. Third, it must decide whether the justifications for the exclusion satisfy the requisite standard for that forum. Am. Civil Liberties Union v. Mote, 423 F.3d 438, 442-43 (4th Cir. 2005) (citations omitted); see Chandler v. Forsyth Tech. Cmty. Coll., No. 1:15CV337, 2016 WL 4435227, at *8 (M.D.N.C. Aug. 19, 2016).

Because of the Supreme Court's plurality opinion in United States v. Alvarez, the court will assume without deciding that Clemmons's false statements qualified as protected speech. 567 U.S. 709 (2012); Moore-King v. Cty. of Chesterfield, Va., 708 F.3d 560, 567 (4th Cir. 2013) ("[W]e cannot agree . . . that inherently deceptive speech necessarily lacks First Amendment protection.")

In addition, in consensus with courts assessing similar forums, the court concludes (and Clemmons has not argued otherwise) that GTCC is a non-public forum. Hazelwood Sch. Dist. v. Kuhlmeier, 484 U.S. 260, 267 (1988); Am. Civil Liberties Union, 423 F.3d at 444 (noting that, like here, "[t]here [was] nothing in

12

the record to indicate that . . . the campus was anything but a
non-public forum for members of the public not associated with the
university"); Chandler, 2016 WL 4435227, at *8 (finding Forsyth
Technical Community College to be a non-public forum).  As a non-
public forum, GTTC is thus entitled to "make reasonable, viewpoint
neutral restrictions on speech in the educational context."
Chandler, 2016 WL 4435227, at *8.

This turns the inquiry to an assessment of Defendants'
justifications for disciplining Clemmons.  In other words, the
question is "whether [the First] Amendment permits the particular
regulation of speech at issue here."  Williams-Yulee v. Florida
Bar, 135 S. Ct. 1656, 1667, 191 L. Ed. 2d 570 (2015).  As Clemmons
properly notes, "students do not 'shed their constitutional rights
to freedom of speech or expression at the schoolhouse gate.'"
Morse v. Frederick, 551 U.S. 393, 396 (2007) (quoting Tinker v.
Des Moines Independent Community School Dist., 393 U.S. 503, 506
(1969)).  But "the constitutional rights of students in public
school are not automatically coextensive with the rights of adults
in other settings."  Bethel School Dist. No. 403 v. Fraser, 478
U.S. 675, 682 (1986).  Indeed, First Amendment rights are
"circumscribed in light of the special characteristics of the
school environment."  Morse, 551 U.S. at 405 (internal citation
and quotations omitted).  Unlike regulations that stem from "an
abstract desire to avoid controversy," a school can properly

13

regulate speech that has a negative effect on the school's mission. Id. at 408-09; see also, Bell v. Itawamba Cty. Sch. Bd., 799 F.3d 379, 390 (5th Cir. 2015) (explaining that "certain speech, which would be protected in other settings, might not be afforded First Amendment protection in the school setting"). Juxtaposed with the right to free speech is the "conflicting, but equally important, need to maintain decorum in our public schools so that the learning process may be carried out in an orderly manner." Hardwick ex rel. Hardwick v. Heyward, 711 F.3d 426, 436 (4th Cir. 2013) (internal citation and quotations omitted).

Here, Johnson was not "regulating" Clemmons's speech because of its content or viewpoint. Rather, he was disciplining her for her dishonesty. GTCC, like all institutions of higher learning, has a legitimate and reasonable justification for enforcing standards of honesty involving student behavior, particularly as it relates to interactions with faculty about school-related topics. This is especially true for a program preparing students for careers in medicine. Keefe v. Adams, 840 F.3d 523, 530 (8th Cir. 2016) ("Given the strong state interest in regulating health professions, teaching and enforcing viewpoint-neutral professional codes of ethics are a legitimate part of a professional school's curriculum that do not, at least on their face, run afoul of the First Amendment.").

14

Moreover, in affirming her suspension, Johnson did not exclude or prohibit Clemmons's speech. Rather, he disciplined her for her repeated false statements, including those made even during the suspension proceeding itself. Id. ("That a graduate student's unprofessional speech leads to academic disadvantage does not 'prohibit' that speech, or render it unprotected; the university simply imposes an adverse consequence on the student for exercising his right to speak at the wrong place and time, like the student who receives a failing grade for submitting a paper on the wrong subject."). Maintaining an environment that demands honesty from students is especially reasonable here, as seen by the testimony of GTCC faculty at Clemmons's appeal hearing, where several expressed concerns about letting a student who exhibited dishonesty practice in a clinical setting. (Doc. 35-13 at 31-32, 44-45; Doc. 35-14 at 32-34.) Put another way, "[a] school need not tolerate student speech that is inconsistent with its 'basic educational mission.'" Hazelwood, 484 U.S. at 266 (quoting Fraser, 478 U.S. at 685).)

For these reasons, the court will deny Clemmons's motion for summary judgment on her First Amendment claim and grant Johnson's motion on the same.

### b. Procedural Due Process

Clemmons argues she was deprived of her education without due process of law. She alleges two deprivations; (1) that she was

15

unable to have an attorney present her case to the Review Committee, and (2) that GTCC officials failed to give her adequate notice of the charges she was facing.

Courts have assumed, without deciding, that university students possess a constitutionally protectable property right in their continued enrollment in a university. Regents of the Univ. of Michigan v. Ewing, 474 U.S. 214, 223 (1985); Tigrett v. Rector & Visitors of Univ. of Virginia, 290 F.3d 620, 627 (4th Cir. 2002); Henson v. Honor Comm. of the Univ. of Virginia, 719 F.2d 69, 73 (4th Cir. 1983) (assuming that student had "protectable liberty or property interest" in Honor Committee disciplinary proceeding). Assuming, without deciding, the same here, the question becomes whether Clemmons was afforded adequate procedural protections during her disciplinary proceedings. The standard for determining what due process is due is flexible. Mallette v. Arlington County Employees' Supplemental Retirement System II, 91 F.3d 630, 640 (4th Cir. 1996) (quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)). "At a minimum, the Constitution requires notice and some opportunity to be heard." Id. (citing Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 178 (1951)). "The nature of the notice and the quality of the hearing are determined by the competing interests involved." Richardson v. Town of Eastover, 922 F.2d 1152, 1159 (4th Cir. 1991); see generally, Butler v. Rector & Bd. of Visitors of Coll. of William & Mary, 121 F. App'x

16

515, 519–20 (4th Cir. 2005). In sum, students are not guaranteed the same procedural rights as criminal defendants or civil litigants. Chandler, 2016 WL 4435227, at *13 (quoting Heenan v. Rhodes, 757 F. Supp. 2d 1229, 1243 (M.D. Ala. 2010)).

Clemmons's first complaint – that her constitutional rights were violated when she was not allowed to have an attorney address the Review Committee during her initial appeal – lacks merit. In support of her argument, Clemmons cites a North Carolina Court of Appeals opinion concerning a high school student's suspension. In re Roberts, 150 N.C. App. 86, 92–93, 563 S.E.2 37, 42 (2002), overruled on other grounds by N. Carolina Dep't of Env't & Nat. Res. v. Carroll, 358 N.C. 649, 599 S.E.2d 888 (2004). The Roberts court ruled that the school violated due process when it refused to allow the student legal representation in his disciplinary proceeding. But the Fourth Circuit has held that students facing disciplinary challenges do not have a right to have an attorney present their case for them. Wimmer v. Lehman, 705 F.2d 1402 (4th Cir. 1983). Moreover, Roberts concerned a high school student, not an adult like Clemmons. Indeed, the Roberts court distinguished its holding from Wimmer on that very ground. Roberts, 150 N.C. App. at 91.

Clemmons's second argument – that she was not provided adequate notice of the charges against her – also fails. True, GTCC officials initially accused Clemmons of "forgery, alteration,

17

or misuse of college documents, records, or instruments of identification providing false information to the College," and the "violation of local, state, or federal criminal law on college premises." (Doc. 35-7 at 2.) But whether Clemmons's actions implicated either prohibition is ultimately not determinative. What matters is whether she was given timely notice of the accusations of her dishonesty, whether her dishonesty violated stated school standards, and whether she had a reasonable opportunity to explain her version of what occurred. While Hughes's October 2 email to Clemmons cited the two aforementioned charges, he later informed her during their October 7 meeting that she was accused of providing false information to college officials. (Doc. 35 ¶ 7.) As Hughes explained, the allegations centered on her claim that her sister had died, when in fact it was her dog. (Id.)

Clemmons does not contest Hughes's account of their meeting. And it appears that she was aware of why Hughes was investigating her actions, as she emailed him on October 6 – before her meeting with Hughes – that she "accept[ed] full responsibility for [the] miscommunication on [her] part." (Doc. 31-2 at 1.) After Hughes conducted his investigation, he sanctioned Clemmons with probation. Clemmons then appealed to the Review Committee, affording her an additional chance to present her side of the story. Before the hearing, Hughes reiterated that she was accused

18

of providing false information to GTCC officials. (Doc. 35-12 at 3, 6.) During the hearing, Clemmons lied again when she explained the "service" that was held for her dog. (Doc. 35-16 at 2.) This was in violation of the Student Code of Conduct, which lists as prohibited conduct "falsifying, distorting or misrepresenting before a Disciplinary Review Committee." (Doc. 35-9 at 3.) The Review Committee then decided to suspend her.

Despite these facts, Clemmons argues that GTCC is retroactively charging her with violations of its policies governing dental students, because it cannot prove that she violated the Student Conduct Policy. (Doc. 39 at 6.) According to Clemmons, "[a]t no time was [she] provided information that her expression of grief and statements were a violation of anything other than the Student Code of Conduct." (Id. at 6.)

The court finds that Clemmons was provided adequate notice. Carboni v. Meldrum, 949 F. Supp. 427, 437 (W.D. Va.), aff'd, 103 F.3d 116 (4th Cir. 1996) ("Federal guarantees of due process only require that a student faced with disciplinary charges at a university be given notice of the charges against her, and a reasonable opportunity to present her side of the story to a neutral decisionmaker.")(citing Goss v. Lopez, 419 U.S. 565, 581, 95 S. Ct. 729, 739–40, 42 L.Ed.2d 725 (1975) and Board of Curators,

19

Univ. of Missouri v. Horowitz, 435 U.S. 78, 83–87 (1978)).[3] While
Clemmons takes issue with GTCC's initial categorization of her
conduct – arguing that GTCC failed to sufficiently explain to her
why she was being investigated – her meeting with Hughes left no
doubt that she was being investigated for dishonesty. In addition,
before her appeal of Hughes' sanction, Clemmons received written
notice that she had been found responsible for providing false
information to a GTCC official in relation to her enrollment.
(Doc. 35-12 at 3.) While Clemmons relies on a parsing of the
Student Conduct Policy, she ignores the Policy's qualification
that its list of prohibited conduct "does not include all conduct
that could be prohibited." (Doc. 35-9 at 2.) Ultimately, all of
Clemmons's misconduct occurred after she had received multiple
instructions that GTCC dental students were to conduct themselves
with honesty. (Doc. 35-1 at 2-5; Doc. 35-2 at 2-4, 7-8.) Indeed,
before enrolling, Clemmons affirmed her understanding that failure
to comply with these policies could result in her suspension.
(Doc. 35-4 at 2.)

        In the end, her argument boils down to a claim that she was

---

[3] Clemmons also argues that GTCC reduced her grades without notice when
she was suspended. (Doc. 33 at 11.) This argument fails. GTCC's
Student Handbook clearly explains that in the event a student is unable
to finish a course, she will receive an "I" for incomplete. (Doc. 42-1
at 4.) Clemmons affirmed that she was aware of this policy when she
signed her "Student Policy Agreement," stating that she had read and
understood all of the "policies, guidelines and regulations" set forth
by the GTCC dental program. (Doc. 35-4 at 2.)

unaware that the Student Conduct Policy prohibited her lying to faculty and staff about matters material to her enrollment. This is facially unpersuasive. Thus, to the extent that Clemmons suggests that she was not given sufficient notice that dishonesty was impermissible, this argument fails.

The court will therefore deny Clemmons's motion for summary judgment on Clemmons's procedural due process claims and grant Johnson's motion on the same, "mindful of the deference courts traditionally accord academic decision-making." Butler, 121 F. App'x at 519.

### c.   Substantive Due Process

Clemmons also advances a substantive due process claim, arguing that her suspension and the reduction in her grades were "constitutionally irrational" and "shocking." (Doc. 33 at 12-13.) Like procedural due process claims, substantive due process claims are triggered by a legitimate claim of entitlement to a property interest. Kerr v. Marshall Univ. Bd. of Governors, 824 F.3d 62, 80 (4th Cir. 2016). But unlike procedural due process claims, determining substantive due process claims involves an assessment of "the reasonableness of the governmental decision." Id. A court begins this assessment by asking whether the challenged conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Hawkins v. Freeman, 195 F.3d 732, 738 (4th Cir. 1999) (quoting Cty. of Sacramento v. Lewis, 523

21

U.S. 833, 847 n.8 (1998)).  If it does not meet that test, the claim fails on that account, with no need to inquire into the nature of the asserted liberty interest.  Id.  If it does meet the threshold test of culpability, the court's inquiry must turn to the nature of the asserted interest and the level of protection to which that interest is entitled.  Hawkins, 195 F.3d at 738. Meeting this threshold test is difficult.  Cty. of Sacramento, 523 U.S. at 849 (conduct shocks the conscience when it is "intended to injure in some way unjustified by any governmental interest") (emphasis added).

Clemmons's suspension and reduction in her grades fail to meet this test.  GTCC officials found that Clemmons was dishonest and acting in an unprofessional manner, each in violation of school policy.  Reasonable minds might differ as to the proper punishment for Clemmons's repeated lies and falsehoods to the faculty and administrators of her dental assisting program.  Perhaps, as Clemmons argues, some may view GTCC's decision to place her on probation, later suspend her, and give her failing grades as harsh punishment.  But in light of her persistent falsehoods, even during the administrative review process, it clearly does not shock the conscience so as to violate her substantive due process rights. See, e.g., Hicks ex rel. Hicks v. Halifax Cty. Bd. of Educ., 93 F. Supp. 2d 649, 665 (E.D.N.C. 1999) ("While the School Board's decision to suspend [a student] on a long-term basis and, thereby,

22

to substantially interrupt and interfere with his educational process, for his failure to wear khaki pants and blue shirt may be a decision disturbingly inconsistent with the most basic goals of the public school system, the court cannot conclude that such a decision 'shocks the conscience' as the Supreme Court has used that term.") (citing Cty. of Sacramento, 523 U.S. at 849); Thomson ex rel. Thompson v. Carteret Cty. Bd. of Educ., No. 90-1010, 1990 WL 77153 (4th Cir. Apr. 17, 1990) (per curiam) (affirming summary judgment for a county that suspended a student after she "consumed approximately three tablespoons of rum just before coming on school premises").

The court will therefore deny Clemmons's motion for summary judgment on her federal substantive due process claims and grant Johnson's motion as to the same.

**B.    State-Law Claims**

In addition to seeking relief under federal law, Clemmons also sought relief, at least in part, under the North Carolina Constitution and North Carolina's Administrative Procedure Act, N.C. Gen. Stat. § 150B-50. For example, she argues that her speech was also protected under the North Carolina Constitution, that the punishment violates her State constitutional rights, and that the discipline meted out is not supported by substantial evidence and is arbitrary, capricious, and an abuse of discretion. (Doc. 4 at 4; Doc. 33 at 11.) As to Clemmons's claim directed toward GTCC,

23

she has moved to strike any evidence Defendants submitted in support of their summary judgment briefing that was not contained in the administrative record on the grounds that, without a proper motion, the State Administrative Procedure Act prohibits the consideration of new evidence upon judicial review.[4] (Doc. 39 at 2.) Defendants contend that Clemmons's claims fare no better under State law and, in any event, her statutory claim is time-barred. (Doc. 37.)

Having resolved her federal claims, the court declines to exercise jurisdiction over the remaining State-law claims. Under 28 U.S.C. § 1367(c), a federal district court "may decline to exercise supplemental jurisdiction" over such State-law claims if "the district court has dismissed all claims over which it has original jurisdiction." The Fourth Circuit has noted in a similar circumstance that "[w]ith all its federal questions gone, there may be the authority to keep [the case] in federal court[,] . . . but there is no good reason to do so." Waybright v. Frederick Cty., Md., 528 F.3d 199, 209 (4th Cir. 2008). This is particularly

---

[4] Clemmons does not specifically identify the new evidence she wishes struck. (Doc. 39 at 6 ("The court should strike and exclude all testimonies, documents and defenses not duly disclosed, in this action, except for the administrative record allowed to be reviewed by the court under N.C. Gen. Stat. § 150B-47.").) In her reply brief in support of her motion, she references Hughes' affidavit (Doc. 35) and its attachments, as well as Johnson's affidavits (Docs. 36, 42) and its attachments. (Doc. 46 at 5.) She contends that Defendants failed to file a petition to the court to present "new evidence related to new theories of the case as required by N.C. Gen. Stat. 150B-49." (Doc. 38 at 2; Doc. 39 at 5-6.)

the case here, where State interests underlie consideration of the remaining State claims. Because this court will dismiss Clemmons's federal claim, therefore, it will decline to exercise supplemental jurisdiction over her State-law claims, which will be remanded to State court. Hinson v. Norwest Fin. S.C., Inc., 239 F.3d 611, 617 (4th Cir. 2001) (recognizing that "the remand power [is] inherent in the statutory authorization to decline supplemental jurisdiction under § 1367(c)").

## II. CONCLUSION

For the reasons stated, therefore,

IT IS ORDERED that Clemmons's motion for summary judgment (Doc. 30) is DENIED, and her motion to strike (Doc. 38) is DENIED AS MOOT.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (Doc. 34) is GRANTED with respect to Clemmons's federal claims, which are DISMISSED WITH PREJUDICE, and otherwise DENIED as to Clemmons's remaining State-law claims, which are REMANDED to the Superior Court of North Carolina for Durham County for further consideration. The court expresses no opinion whether Clemmons's State-law claims are barred in whole or in part as a result of this court's disposition of her federal claims.


                                        /s/    Thomas D. Schroeder
                                        United States District Judge
July 21, 2017

                                   25